FILED

UNITED STATES DISTRICT COURT   2018 JAN 16 AM 9: 26
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

UNITED STATES OF AMERICA and
STATE OF FLORIDA
*ex rel.*
NEERAJ SHARMA,
GREGORY L. ORTEGA,
SANTOSH M. NAIR, and
RENE CABEZA,

          Plaintiffs,

          v.

FLORIDA CANCER SPECIALISTS, P.L. and
ADVENTIST HEALTH SYSTEM SUNBELT
CORPORATION,

          Defendants.

Civil Action No. 6:18-cv-77-Orl-41DCI

**FILED UNDER SEAL**
**PURSUANT TO 31 U.S.C. § 3730(b)(2)**

JURY TRIAL DEMANDED

**DO NOT PLACE IN PRESS BOX**
**DO NOT ENTER ON PACER**

## COMPLAINT

**I.    Introduction**

1.    Florida Cancer Specialists, P.L. ("FCS"), and Adventist Health System Sunbelt

Healthcare Corporation ("Adventist"), through its Florida Hospital affiliates in Volusia and

Flagler Counties, have entered into arrangements in which each provides the other with various

forms of remuneration in exchange for patient referrals. These arrangements are intended to

induce, and have had the effect of inducing, the trading of referrals between Adventist and FCS.

The various remunerative schemes are not subject to any safe harbor provision of the Anti-

Kickback Statute.

2.    In July of 2014, FCS and Adventist entered into an express, written agreement under

which FCS is provided with various exclusive roles at Adventist's hospitals in Volusia and

Flagler Counties—roles that ensure FCS receives an automatic and steady flow of patient referrals. For instance, the agreement provides that FCS will be the sole provider of emergency department call at those hospitals and that all unassigned emergency department patients will be assigned to FCS for any medical oncology or hematology treatment they require. It further provides that FCS physicians are the only hematologists or oncologists who will be granted clinical privileges or medical staff membership at the Adventist Hospitals in Volusia and Flagler Counties. These exclusive roles amount to a voucher for patient referrals, and are intended as an inducement to FCS to direct radiation oncology, radiology/imaging, and surgical referrals to Adventist's hospitals.

3.      The same express, written agreement provides both that Adventist would no longer compete in the markets for outpatient hematology and medical oncology services in Volusia and Flagler Counties, and that FCS would not enter and compete with Adventist in the outpatient radiation oncology or radiology/imaging markets in Volusia and Flagler Counties. Because competition between FCS and Adventist (as existed prior to their market allocation agreement) would exert downward pricing pressure and upward pressure on the quality of care they provide, FCS and Adventist instead opted to each confer on the other a guaranteed flow of referrals in exchange for the elimination of competition.[1]

---

[1] Prior to entering into its agreement with FCS, Adventist employed medical oncologists/hematologists in Volusia and Flagler counties and competed with FCS in the outpatient oncology and hematology markets in Volusia and Flagler counties. Also at the time the agreement was entered into, FCS competed in the radiology market in Volusia County through its mobile imaging units, which made regular visits to FCS's office in Lake Mary, and to which FCS physicians in Volusia County sent their patients for radiology services. After entering into the agreement, Adventist turned over its medical oncologists to be employed by Florida Cancer Specialists. Similarly, FCS has stemmed the flow of referrals of its patients to its own mobile imaging units for radiology services. Instead, it directs those patients to Adventist's hospitals for such services—at the higher billing rates charged by the hospitals. Since entering into its agreement, FCS has not entered the radiation oncology market in Volusia and Flagler counties, although it has done so at other locations throughout the state during the same period of time.

4.      Adventist and FCS have further agreed to aggressively channel referrals to one another. As described to Relators by Adventist-employed physicians, individuals in the administration of the Adventist hospitals subject to the agreement routinely visit those Adventist-employed physicians to discuss with them their referral patterns for hematology and oncology, and to coerce them to direct hematology and oncology referrals to FCS physicians. Similarly, FCS steers substantially all of its referrals to Adventist-employed physicians for radiation therapy, radiology/imaging services, surgical services, lab services, and consultative services.

5.      Adventist also facilitates a variety of exclusive marketing opportunities for FCS physicians at which FCS, and only FCS, is afforded the opportunity to market itself to Adventist physicians, or to independent community physicians. These events present FCS as the hospitals' endorsed and preferred provider of hematology and medical oncology services, leveraging Adventist's Florida Hospital brand in order to elevate FCS's own. Many of these events include complimentary food and/or gifts for attendees. Adventist also actively markets FCS (and only FCS) on its own websites.

6.      Although the government recently declined intervention in a recently unsealed *qui tam* action in the Fort Meyers division of the Middle District of Florida against FCS and 21st Century Oncology ("21st Century") in which the relators alleged a market allocation agreement between FCS and 21st Century similar to that alleged here, significant differences exist here that weigh in favor of intervention. First, numerous additional remunerative schemes, outlined above and described in greater detail below, are present here. Second, the market allocation agreement alleged in the other action was a "gentlemen's agreement," meaning its existence would first have to be proven before it could constitute a kickback arrangement. Here, the agreement is in writing, and its existence has been affirmed in the sworn testimony of Adventist and FCS

executives. Third, Adventist's and FCS's concerted efforts to influence referral patterns mutually

to one another make clear that their overwhelming purpose was to secure patient referrals. The

trading of referrals for referrals, the provision of exclusive access to referral sources, agreeing

not to compete, and one provider's promotion and marketing of another, to the exclusion of all

other providers, have each been held to plausibly constitute remuneration within the meaning of

the AKS. Each of those is present here, accompanied by clear intent to induce referrals.

## II.     Jurisdiction and Venue

7.      This Court has jurisdiction over Relators' claims under federal law pursuant to 31 U.S.C.

§§ 3730 and 3732(a), and 28 U.S.C. §§ 1331 and 1345, because Defendants reside, transact

business, and committed proscribed acts in this District. This Court has jurisdiction over

Relators' claims under the Florida False Claims Act pursuant to 28 U.S.C. § 1367(a) and 31

U.S.C. § 3732(b) because those claims are so related to their federal claims that they form part of

the same case or controversy, and they arise from the same transactions and occurrences.

8.      Venue lies in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)

and (c), as the place where Defendants reside and transact business, and where a substantial part

of the events or omissions giving rise to the claims occurred.

## III.    The Parties

9.      Relators Neeraj Sharma, Gregory L. Ortega, Santosh M. Nair, and Rene Cabeza are

medical oncologists practicing in Volusia and Seminole Counties. They are partner physicians of

Mid-Florida Hematology & Oncology Centers, P.A., d/b/a Mid-Florida Cancer Centers, which

has offices in DeLand, Orange City, Sanford, and Oviedo. As competitors of both Adventist and

FCS, they have been harmed by certain conduct described herein and are involved in litigation

against Adventist and FCS pending in Circuit Court in Volusia County. Relators maintain

ongoing relationships with physicians employed by Adventist and practicing at Adventist

4

hospitals in Volusia and Flagler Counties. These physicians often discuss with Relators practices occurring at Adventist's hospitals with respect to the treatment and referral of hematology and oncology patients. In addition to these sources of information, Relators also have firsthand knowledge of many of the facts detailed herein.

10.     Defendant FCS is a medical group and a Florida Limited Liability Company headquartered in Fort Myers, Florida, practicing both medical and radiation oncology and hematology,[2] with offices throughout the state of Florida. FCS is the largest independent medical oncology practice group in the United States, with more than 200 physicians, 150 nurse practitioners, and over 90 locations in its network. FCS treats approximately 60,000 new patients each year and conducts over 1 million follow-up visits each year.

11.     FCS has been characterized in the press and in litigation as a high-cost, high-utilization provider. For instance, in 2014, the Wall Street Journal reported, based on an analysis of Medicare billing data, that 28 of FCS's doctors "were among the top 100 U.S. oncologists by 2012 Medicare payments for all services." That is, 28 of the 100 highest-billing oncologists in the country at the time, according to Medicare billing data, practiced at FCS. Further, the article reported that the government paid more than $3 million each to 22 different FCS physicians. The same article discusses that FCS physicians collectively were responsible for one sixth of Medicare's 2012 expenditures on the drug Procrit in the entire country, despite FDA warnings to doctors as far back as 2002 to stop prescribing the drug liberally. *Wall Street Journal*, Cancer Doctors Ring Up Big Medicare Bills for Tarnished Drug Procrit, June 19, 2014, available at https://www.wsj.com/articles/cancer-doctors-ring-up-big-medicare-bills-for-tarnished-drug-procrit-1403203821.

---

[2] Medical Oncology generally focuses on treatment of cancer with chemotherapy, targeted therapy, immunotherapy and hormonal therapy; radiation oncology focuses on treatment of cancer with radiation.

12.     Similarly, relators in the above-referenced *qui tam* action in the Fort Meyers division of

the Middle District of Florida against FCS and 21st Century Oncology, allege that FCS, pursuant

to express instruction from FCS's President William Harwin, engages in a program of systematic

overuse of the drug Feraheme, falsifying patient medical records in order to justify

administration of the drug. Also, Humana Medical Plan, Inc., terminated FCS's provider contract

in 2014, and internal Humana emails state that the termination was "due to concerns over quality

of care, providing the right treatment protocols, and financial gaming of the system." State of

Florida Office of Insurance Regulation, Target Market Conduct Final Examination Report,

available at https://www.floir.com/siteDocuments/HumanaMedicalPlan10302015.pdf, at 8.

13.     Defendant Adventist Health System is a health care organization headquartered in

Altamonte Springs, Florida, that operates 45 hospitals in 10 states and also owns multiple

physician groups. Adventist is a recidivist violator of the False Claims Act, including in its

medical and radiation oncology service lines. It has settled False Claims Act cases alleging that it

paid bonuses to its physicians based on the number of tests and procedures they ordered; alleging

that it reused single-use vials of chemotherapy drugs; and alleging that it provided radiation

oncology services to patients without supervision by radiation oncologists or other similarly

qualified professionals. Department of Justice, Adventist Health System Agrees to Pay $115

Million to Settle False Claims Act Allegations, https://www.justice.gov/opa/pr/adventist-health-

system-agrees-pay-115-million-settle-false-claims-act-allegations; Department of Justice,

Adventist to Pay More than $2 Million to Resolve False Claims Allegations,

https://www.justice.gov/usao-mdfl/pr/adventist-pay-more-2-million-resolve-false-claims-

allegations; Department of Justice, Adventist Health System to Pay $5.4 Million to Resolve

6

False Claims Act Allegations, https://www.justice.gov/opa/pr/adventist-health-system-pay-54-million-resolve-false-claims-act-allegations.

## IV.    Defendants' Schemes

14.    The federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a–7b(b), prohibits paying or receiving kickbacks to induce the referral of an individual for services paid under a federal health care program. 42 U.S.C. § 1320a–7b(b)(1)–(2). In 2010, Congress amended the statute to specify that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act]." 42 U.S.C. § 1320a–7b(g). Thus, claims for services tainted by kickbacks are false claims.

15.    Relators' claims under the False Claims Act are premised on underlying violations of the AKS. A violation of the AKS occurs when a defendant: (1) knowingly and willfully, (2) "offers or pays any remuneration," directly or indirectly, (3) to induce a person to refer individuals to the defendants for the furnishing of medical services, (4) paid for by Medicare. *United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 705 (11th Cir. 2014) (citing 42 U.S.C. § 1320a–7b(b)(2)(A)). In a tandem provision, the Anti-Kickback Statute prohibits "solicit[ing] or receiv[ing] any remuneration." 42 U.S.C. § 1320a–7b(b)(1)(A).

### A. Remuneration

16.    Adventist and FCS have each given the other remuneration worth many millions of dollars as inducement to secure the referral of substantially all oncology patients in the allocated markets in which they operate pursuant to their market allocation agreement. The primary forms of remuneration exchanged are 1) exclusive roles for FCS at Adventist hospitals, which amount to vouchers for patient referrals, 2) withdrawal from and agreements not to compete outside of allocated markets, 3) patient referrals themselves, which FCS and Adventist trade and steer substantially all of to one another to the exclusion of other providers, and 4) free and discounted

7

marketing provided by Adventist to FCS (and only FCS), as well as exclusive opportunities

provided to FCS by Adventist for FCS to market its physicians and its services to Adventist-

employed providers, including not only hospital employees but also physicians practicing in

outpatient settings.

17.     The remuneration exchanged between Adventist and FCS has caused false statements to

be made for the purpose of getting false claims paid, in violation of 31 U.S.C. § 3729(a)(1)(B).

This conduct further makes Adventist and FCS liable as co-conspirators under 31 U.S.C.

§ 3729(a)(1)(C) because they agreed to violate the AKS and engaged in conduct to do so.  As set

forth in detail below, the Government has paid these false claims and suffered substantial losses.

>           **i.     Adventist Grants FCS Exclusive Roles that Amount to a Voucher for Patient**
>                   **Referrals**

18.     As described above, Adventist has granted FCS the exclusive right to obtain clinical

privileges in the fields of hematology and medical oncology at Adventist hospitals in Volusia

and Flagler Counties. Adventist has the only open-staff hospitals in all of Volusia and Flagler

Counties (Halifax being the only other hospital system and having a closed system in which only

Halifax-employed hematologists and medical oncologists can practice at its hospitals). As such,

medical staff membership and possession of clinical privileges at Adventist's hospitals are a *sine*

*qua non* of attracting patient referrals for oncology, as oncology patients frequently require

emergency or inpatient admission, and physicians will not refer to oncologists who lack

admitting privileges at area hospitals.

19.     Adventist has contracted with FCS to direct every unassigned emergency department

patient requiring hematology or medical oncology treatment to FCS. Adventist has also

contracted to turn over the hematology/oncology call schedule exclusively to FCS. When it

attempted to implement this term of its contract with FCS, the medical staff refused to approve

the change, and instead the Adventist hospitals abolished the call schedule, opting to effectuate FCS's exclusive access to these patients through less formal methods. Substantially all unassigned emergency department patients requiring hematology or oncology treatment are in fact directed to FCS today.

20.     The exclusive access and roles that Adventist provides to FCS at its hospitals is a form of in-kind remuneration that Adventist pays to induce FCS to direct substantially all referrals for radiation oncology, radiology/imaging, and surgical services to Adventist, which FCS does.

21.     The provision of exclusive access to a source of new patients has been held to constitute remuneration within the meaning of the AKS. In *United States v. Health Alliance of Greater Cincinnati*, the relator alleged that the defendant hospital system assigned time to cardiologists in the hospital's heart station in exchange for cardiologists directing referrals to the hospital. No. 1:03-CV-00167, 2008 WL 5282139, at *1 (S.D. Ohio Dec. 18, 2008). The relator contended "that a doctor in the heart station is being handed a stream of patients, which is like receiving a voucher." *Id.* at *6. The relator also alleged "that Defendants' scheme favored Defendant Ohio Heart and Vascular Center ('Ohio Heart'), which was the dominant cardiology group at TCH, by ensuring a continuous flow of referrals between Ohio Heart and TCH, to the exclusion of other hospitals and cardiology groups." *Id.* at *1. The court held:

> Having reviewed this matter, the Court finds **no question** that Plaintiff has adequately pleaded Defendants set up a system whereby Ohio Heart physicians received something of value, time in the heart station at TCH, in exchange for referrals. . . . Here, the government has pleaded facts showing that time in the heart station was essentially money, and further, that Defendants' system excluded cardiologists from the benefit of heart station time when their referral levels did not qualify them for such time. The Anti-Kickback Statute uses the term "any remuneration," which suggests an expansive reading of the form of any kickback directly or indirectly, as opposed to a narrow reading that would exclude the benefit of heart station time.

*Id.* at *7 (citations omitted, emphasis added).

22.     The facts are much the same here. Adventist and FCS agreed to a scheme under which

FCS would direct referrals to Adventist hospitals and, in exchange, Adventist would, as one of

several forms of remuneration, grant FCS exclusive access to various streams of patient referrals

controlled by Adventist. Relators were excluded from accessing these referral sources because

they would not agree to channel referrals for radiation oncology and radiology services (services

Relators provide and therefore need not refer elsewhere) to Adventist. Instead, Adventist has

constructed a closed loop of referral swapping with FCS, "ensuring a continuous flow of

referrals between [Adventist] and [FCS], to the exclusion of other hospitals and [oncology]

groups." *See id.* at *1.

23.     In *Health Alliance of Greater Cincinnati*, the defendants subsequently sought to certify

the district court's order denying their motion to dismiss for interlocutory appeal based in part on

the district court's determination that time in the heart station could constitute remuneration

under the AKS. 2009 WL 485501, at *3 (S.D. Ohio Feb. 26, 2009). The government argued "that

the trading of referrals for referrals and guaranteed work illustrates an 'in kind' exchange." *Id.*

The court found insufficient grounds for difference of opinion as to this determination to warrant

interlocutory appeal:

> Having reviewed this matter, the Court is unconvinced there is substantial ground
> for difference of opinion as to its conclusion that time in the TCH heart station
> could constitute "remuneration" under the Anti–Kickback Statute. The referral
> system Defendants allegedly used, that clearly profited Defendants to the
> exclusion of doctors shut out from work and opportunities to gain new patients,
> does not merely present a question of "routine staffing decisions" or "the
> opportunity to work." The benefits were real and were guarded by Defendants, as
> evidenced by their creation of the alleged shell entity, MDA, to continue
> implementation of the alleged scheme. The Court finds well-taken the
> government's position that heart station panel time could constitute remuneration,
> under the text of the Anti–Kickback Statute, all regulatory guidance, all relevant
> case law, the statute's legislative history, and common sense. Defendants' cited
> case authority to the contrary . . . do not create the requisite serious doubt on the
> remuneration question so as to create a substantial ground for difference of

10

opinion.

*Id.* at \*4 (citations omitted).

### ii. Adventist and FCS Each Withdrew from Competing with One Another, and Agreed Not to Compete with One Another Across Service Lines

24.     Adventist previously employed medical oncologists/hematologists who provided services in Volusia and Flagler Counties in competition with FCS. FCS previously competed with Adventist in the radiology/imaging market through its mobile imaging units, which it brought to its office in Lake Mary, and to which FCS physicians practicing in Volusia County directed patients requiring radiology/imaging services. Further, FCS competes in the field of radiation oncology at locations throughout the state outside Volusia and Flagler Counties.

25.     Despite the fact that Adventist and FCS have offered these services in the past (or presently offer them outside Volusia and Flagler Counties) and are capable of offering these services within Volusia and Flagler Counties, they have agreed that FCS will not offer radiation oncology or radiology/imaging services within Volusia and Flagler Counties for the duration of their agreement and for 18 months thereafter, and that Adventist will not offer medical oncology or hematology services within Volusia and Flagler Counties for the duration of their agreement and for 18 months thereafter. Pursuant to this agreement, Adventist ceased competing in the medical oncology and hematology areas and offered up the medical oncologists/hematologists it previously employed in Volusia and Flagler Counties to FCS so that FCS could employ them. Meanwhile, FCS has stemmed the flow of its referrals to FCS's own mobile imaging units and instead directs those patients to Adventist for radiology/imaging services, where those services are billed at higher rates.

26.     An agreement not to compete is unambiguously a thing of value and has been held to plausibly constitute remuneration within the meaning of the AKS. *United States v. Bozeman*

11

*Health*, No. CV 15-80-BU-SEH, 2017 WL 514205, at *5 (D. Mont. Feb. 7, 2017) ("The

Complaint also alleges Bozeman Health received remuneration by: '. . . [4] non-compete

agreements from the radiologists who . . . provide professional services at AMI,' all of which are

claimed to be contrary to the AKS and to demonstrate the plausibility that at least one purpose of

the joint venture was to knowingly and willfully exchange patient referrals paid for by federal

health care programs for remuneration."). Withdrawal from active competition is arguably of

even greater value than an agreement not to compete in the future and makes Adventist's and

FCS's conduct here even more egregiously remunerative than that in *Bozeman Health*. Further,

Adventist handed over its employed medical oncologists/hematologists to be employed by FCS.

The exclusive option to employ experienced hematologists/oncologists with established practices

and relationships with community physicians constitutes a thing of value for a

hematology/oncology practice.

27.     Testimony of FCS's own Dr. Victor Melgen establishes that FCS specifically sought to

eliminate the threat of competition from Adventist when negotiating the exclusive services

agreement. He has testified that the exclusive services agreement "was a way to prevent Florida

Hospital to bring oncologists to the area" and that "we were trying to prevent Florida Hospital to

bring new employed oncologists," who of course would compete with FCS's oncologists if they

practiced in Volusia and Flagler counties. Clearly, then, FCS valued and bargained for the

agreement not to compete that it ultimately traded for patient referrals.

28.     Similarly, Adventist bargained for the reciprocal agreement of FCS not to compete with

respect to radiation oncology and imaging services. Former President and CEO of Adventist's

Florida Hospitals in Volusia and Flagler counties, Daryl Tol, has testified as follows regarding

language outlining FCS's agreement not to compete:

> **Q.** And: "Florida Cancer Specialists would agree
> to a moratorium of expansion of any diagnostic imaging
> and/or the technical radiation oncology services within
> the Volusia and Flagler County during the term of the
> agreement."
>
> Was that something that was requested by
> Florida Hospitals or is that something that was
> suggested by Florida Cancer Specialists?
>
> **A.** [ . . . ] I'm
> sure we suggested that. I'm certain.

29.     Thus, both FCS and Adventist not only valued the other's agreement not to compete, they

actively bargained for it. This leaves no question that the agreements not to compete exchanged

between Adventist and FCS constitute remuneration within the meaning of the AKS.

### iii.    Adventist and FCS Aggressively Channel Referrals to One Another

30.     Having conferred on each other the mutual benefit of no longer competing for the same

pool of patient referrals, Adventist aggressively channels referrals to FCS in exchange for

referrals channeled to Adventists from FCS, and vice versa. This referral trading is not simply

the natural consequence of their market allocation agreement, which by itself might tend to

increase the number of referrals exchanged between FCS and Adventist. Adventist and FCS

undertake active measures to ensure that the maximum possible referrals are directed to each

other.

31.     Adventist coerces its employed physicians to direct their patients to FCS. Indeed,

Adventist-employed physicians practicing in various specialties have detailed to Relators that

they are regularly visited by administrators for the purpose of discussing their referral patterns.

Specifically, these administrators discuss with them where these physicians are referring

hematology/oncology patients and inquire as to the reasons that individual referrals have been

made to hematologists/oncologists other than those practicing at FCS. These physicians have

13

learned that the only answer that avoids further interrogation is "patient preference." These physicians have described their referral patterns as being "monitored."

32.     Adventist-employed hospitalists, in particular, have informed Relators on multiple occasions that they have been specifically instructed to direct all hematology and oncology referrals to FCS. More broadly, but including with respect to oncology referrals, Adventist-employed hospitalists have repeatedly raised concerns internally about being pressured by hospital administration to refer patients to certain specialists, rather than on the basis of their clinical judgment and the patients' interests. The issue of being pressured to steer referrals was recently raised by multiple members of the Medical Executive Committee for Adventist's Florida Hospital Fish Memorial, where a motion was made that the treating physician should determine to which specialist a patient is referred. The Medical Executive Committee approved that motion by unanimous vote, but the administration of the hospital expressed resistance to enacting it.

33.     Recently, as described to Relators by Adventist-employed physicians, those Adventist-employed physicians practicing in non-hospital-based specialties have been instructed not to specify a provider at all when making referrals—to specify only the specialty. As described to Relators, these referrals are then routed to an Adventist administrator who selects the provider who will receive the referral. Any oncology referrals made in this fashion in Volusia and Flagler Counties are directed exclusively to FCS physicians unless there is no FCS physician capable of providing the service in question. If the Adventist-employed physicians do specify a particular physician in their referral, they will be interrogated as to their reason for doing so. As also described to Relators by patients who were initially referred to FCS, even where those patients

expressed their desire to be treated by Relators' oncology group, they were routed to FCS instead.

34.     Adventist's and FCS's aggressive efforts have been effective in directing referrals to one another that would otherwise be sent elsewhere. This despite the fact that, during the same period of time in which FCS has greatly increased the number of radiation oncology referrals it directs to Adventist's hospitals in Volusia and Flagler Counties, there have been widespread concerns among the physician community generally about the quality of Adventist's radiation oncologists practicing at Adventist's Florida Hospital Fish Memorial, who at the time were *locum tenens* (temporary) physicians. For instance, Relators' staff were told by staff of Florida Hospital Fish Memorial itself about such concerns regarding the quality of care provided by those *locum tenens* radiation oncologists, including concerns expressed by patients about the fact that they did not have a consistent physician overseeing their treatment (due to the temporary nature of those physicians' status at the hospital). Similar concerns were expressed even by FCS's own Dr. Victor Melgen regarding consistency and quality of care provided by these *locum tenens* radiation oncologists, and those concerns were conveyed to Relators' staff by staff at Florida Hospital Fish Memorial.

35.     An oncologist practicing in a nearby county recently interviewed an employee of Adventist's Florida Hospital DeLand working in the radiation oncology program at that hospital. As described by the interviewing oncologist to Relators, this Adventist employee detailed efforts to "muscle every referral" for hematology and oncology to FCS.

36.     Prior to their exclusive agreements, FCS directed a substantially smaller portion of its referrals to Adventist physicians for radiation oncology, radiology/imaging, and surgical services, and Adventist directed significantly fewer referrals for medical oncology and

hematology to FCS. Relators have felt the impact of the referral-trading scheme on their own

practice, and they believe that other practices have as well. Notably, the physician community in

the DeLand and Orange City areas as a whole (excluding physicians employed by Adventist and

FCS) refers patients to Relators and to FCS in approximately equal proportions, with Mid-

Florida receiving perhaps closer to two-thirds of total referrals among this group. Moreover,

most referring physicians (again, excluding those employed by Adventist and FCS) split their

referrals between Mid-Florida and FCS—that is, very few refer on an exclusive or near-exclusive

basis. These facts illustrate that the volume and proportion of referrals that FCS and Adventist

direct to one another is not a naturally occurring phenomenon and is out of line with the practices

of community physicians operating outside the influence of a referral-trading scheme. Rather, the

high percentage of referrals that Adventist and FCS direct exclusively to one another reflects

their agreement to mutually trade patient referrals for patient referrals.

37.     As noted above, in *Health Alliance of Greater Cincinnati*, where the government argued

"that the trading of referrals for referrals and guaranteed work illustrates an 'in kind' exchange"

under the AKS, the court found the government's position "well-taken . . . under the text of the

Anti–Kickback Statute, all regulatory guidance, all relevant case law, the statute's legislative

history, and common sense." *Id.* at *4. The structure of the arrangements between Adventist and

FCS here is highly similar, only with additional remunerative schemes between the parties, as

well as documentary evidence of intent to use these schemes as inducements to refer patients.

### iv.     Adventist Offers FCS (and only FCS) Free Marketing

38.     Adventist confers on FCS a variety of free marketing and promotional benefits. Adventist

provides FCS exclusive access to Adventist-employed physicians through regular group and

individual meetings with those physicians. These meetings provide FCS (and only FCS) the

opportunity to market itself to Adventist physicians (who comprise a significant portion of the

16

local referral base). To be clear, these are events at which FCS is given the exclusive opportunity to engage in targeted, focused marketing of itself, its physicians, and its services to Adventist-employed physicians.

39.     Similarly, Adventist organizes and puts on community events at which FCS is given the exclusive opportunity to market itself. Adventist markets these events to Adventist and community physicians, and thereby also markets FCS and the FCS physicians, both of which are frequently promoted in the marketing materials for these events. These include events such as Survivors Day Celebration, which are attended by hundreds of cancer survivors (many of whom require ongoing monitoring and are therefore prospective oncology patients) and other members of the community. Adventist also conducts open house events at its Florida Hospital campuses at which complimentary food and gifts are provided to all attendees. FCS (and only FCS) is given the opportunity to market itself at these events. Further, Adventist provides fee continuing education courses to its employed physicians and mid-level practitioners. Again, FCS physicians, and only FCS physicians, are given a platform at continuing education events, participating in panel discussions and in other settings that lend an aura of expertise and Adventist's endorsement to FCS. Further it is not clear to what degree, if any, the costs of producing these events is shared between Adventist and FCS, including costs of the complimentary gifts and food provided to attendees.

40.     A hospital's promotion and marketing of a particular provider group may constitute remuneration under the AKS. *United States v. Millennium Radiology, Inc.*, No. 1:11CV825, 2014 WL 4908275, at *6 (S.D. Ohio Sept. 30, 2014). Further, providing free marketing is necessarily providing something of value at below market rates. *Id.* at *5. ("In this instance, Hallman has alleged that MRI provided . . . marketing services to Mercy for free. As this Court

17

observed in *McDonough,* providing these services for free would necessarily be providing them at below market rates and below cost."). As in *Millennium Radiology*, Adventist has used its own facilities, employees, and brand in order to promote and market FCS.

41.     Adventist and FCS are co-branded on billboards throughout Volusia and Flagler Counties, and it is not clear to what extent the costs of such billboard advertising are split between Adventist and FCS. Further, Adventist, as a not-for-profit organization, has access to lower billboard advertising rates. As such, to the extent that FCS does share the cost of any co-branded billboard space, any passing along of Adventist's discounted cost constitutes remuneration paid by Adventist to FCS.

42.     In addition, Adventist provides free marketing to FCS (and only FCS) on the websites for its hospitals in Volusia and Flagler Counties that are subject to the agreement between Adventist and FCS. *See, e.g.*, https://www.floridahospital.com/deland/cancer/florida-cancer-specialists; https://www.floridahospitalcancer.org/treatments/medical-oncology; https://www.floridahospitalcancer.org/why-us/locations.

### B.  Intent to Induce Referrals

43.     The AKS prohibits payment of remuneration that is intended to induce patient referrals. However, a relator need only show that *one* purpose of the remuneration was to induce such referrals. *United States ex rel. Ruscher v. Omnicare, Inc.*, 663 F. App'x 368, 374 (5th Cir. 2016); *United States ex rel. Armfield v. Gills*, No. 8:07-CV-2374-T-27TBM, 2012 WL 12918277, at *4 (M.D. Fla. Oct. 18, 2012). Further, "under the anti–kickback statute, neither a legitimate business purpose for the arrangement, nor a fair market value payment, will legitimize a payment if there is also an illegal purpose (i.e., inducing Federal health care program business)." Department of Health and Human Services Office of Inspector General, Supplemental Compliance Program Guidance for Hospitals, 70 Fed. Reg. 4858, 4864, 2005 WL 192293 (January 31, 2005).

18

44.     Deposition testimony of Adventist and FCS employees establishes the remunerative

schemes outlined above were intended to induce referrals. Danielle Johnson, Chief Operating

Officer at Adventist's Florida Hospital Fish Memorial, testified as follows:

> **Q**. Has Dr. Melgen [of FCS] ever voiced any complaints about the number of
> patients that the exclusive contract has generated referrals to Florida Cancer
> Specialists?
>
> [ . . . ]
>
> Generally, has he made any comments to you at all about that subject?
>
> **A**. I think he would -- I don't know. I think it's best you probably ask him.
> There's been sort of a -- I don't know -- a general hope that he would be busier,
> but it is what it is, I guess.
>
> **Q**. When you say a general hope that Dr. Melgen would be busier, whose hope is
> that?
>
> **A**. Well, it's not mine. It's Dr. Melgen's.

45.     This "general hope" that FCS would receive more patient referrals evidences that

inducing referrals was at least one purpose of the various forms of remuneration FCS provided

Adventist. And of course, referrals to FCS also result in referrals to Adventist, since medical

oncologists are by far the largest source of referrals for radiation oncology and oncology-related

imaging services, and since FCS has agreed not to compete with Adventist in the radiation

oncology and radiology/imaging markets and instead to direct all of its patients requiring those

services to Adventist. Referrals to FCS have also resulted in increased referrals to Adventist for a

range of other procedures, labs, and consultative services that FCS generates.

46.     That Adventist undertook concerted efforts to influence the referral patterns of its

employed physicians immediately following the execution of the exclusive agreements between

FCS and Adventist, as described to Relators by Adventist-employed physicians themselves, also

evidences that the purpose of paying the various forms of remuneration outlined above was inextricably tied to the generation of patient referrals between Adventist and FCS.

### C. Defendants' Remunerative Schemes, and the Resulting Submission of False Claims, Are Knowing and Willful

47.     The FCA imposes liability on any person who knowingly presents or causes to be presented to the federal government a false claim. 31 U.S.C.A. § 3729(a). The FCA defines "knowingly" to include "actual knowledge," "deliberate ignorance," or "reckless disregard." 31 U.S.C.A. § 3729(b). Proof of specific intent to defraud is not required. *Bingham v. BayCare Health Sys.*, No. 8:14-CV-73-T-23JSS, 2016 WL 8739056, at *2 (M.D. Fla. Dec. 16, 2016), *report and recommendation adopted*, No. 8:14-CV-73-T-23JSS, 2017 WL 1386838 (M.D. Fla. Apr. 18, 2017) (citing 31 U.S.C. § 3729(b)(1)(B)). "Congress added the 'reckless disregard' provision to the False Claims Act in 1986 . . . to ensure that 'knowingly' captured the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1058 (11th Cir. 2015) (quoting S. Rep. 99–345, at 21, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5286) (quotations omitted). "Reckless disregard" for purposes of the FCA amounts to gross negligence or "an extreme version or ordinary negligence." *Id.*

48.     The discussion above makes clear that the overarching purpose of the various arrangements between Adventist and FCS was to furnish in-kind remuneration to one another in order to induce a mutual agreement to direct substantially all hematology and oncology referrals to one another. There can be no question that the false claims submitted by Adventist and FCS were submitted with, at a minimum, reckless disregard for their truth or falsity.

49.     The AKS prohibits knowing and willful payment of remuneration for the purpose of inducing patient referrals. The term "willfully" for purposes of the AKS means that an "act was

committed voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law." *United States v. Starks,* 157 F.3d 833, 838 (11th Cir.1998) (internal quotation marks omitted). It is not necessary to prove that a defendant acted with specific intent to violate the Anti–Kickback Statute. *Id.* at 838–39 & n. 8. Rather, it is simply necessary to prove that the defendant acted with the intent to do something the law forbids—even if he is not aware of the specific law his conduct may violate. *Id.; see also McNutt ex rel. U.S. v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1260 (11th Cir. 2005). The remuneration paid between Adventist and FCS was not paid by accident, and it was exchanged for the purpose of inducing referrals, which is something the AKS forbids. As such, the AKS violations of Adventist and FCS were willful.

**D. The Remunerative Schemes Also Violate the Stark Law**

50.     The analysis outlined above as to the AKS is substantially the same for purposes of the Stark Law, 42 U.S.C. § 1395nn. "Under both the Anti–Kickback Statute and Stark, a medical provider cannot enter into a relationship with a referring physician that involves remuneration—*i.e.,* any payment or other benefit." *U.S. ex rel. Osheroff v. Tenet Healthcare Corp.*, No. 09-22253-CIV, 2013 WL 1289260, at *7 (S.D. Fla. Mar. 27, 2013). Because, as outlined above, the remuneration exchanged between Adventist and FCS is not merely intended to induce referrals but actually has induced referrals, the referrals exchanged between Adventist and FCS are made by physicians to entities providing designated health services ("DHS")[3] where a compensation arrangement (i.e., remuneration) exists between the referring physicians and the entities to whom those patients were referred. For instance, the exclusive right to provide services at a hospital constitutes remuneration and therefore establishes a compensation arrangement within the

---

[3] Here, the designated health services provided by Adventist and FCS pursuant to referrals to each other include inpatient and outpatient hospital services, laboratory services, radiology services, and radiation therapy services.

meaning of the Stark Law. *U.S. ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 96 (3d Cir.

2009). Unlike the AKS, the Stark Law does not contain a scienter requirement—the referral of

patients to a DHS entity with which the physician has a financial relationship (defined to include

any remuneration) is automatically a violation of the Stark Law unless a safe harbor applies.

*Osheroff*, 2013 WL 1289260, at *7, *9.

### E. No Safe Harbor Applies

#### i. The Remuneration Paid Takes into Account the Value of Referrals Generated

51.     The Department of Health and Human Services has promulgated regulations establishing

safe harbors for certain arrangements between healthcare providers which remove them from the

scope of the AKS and the Stark Law. *See* 42 U.S.C. § 1320a–7b(b)(3)(E). No such safe harbor is

applicable here as to any of the arrangements outlined above, as any safe harbor that might be

invoked requires that the arrangement not take into account the volume or value of any referrals

generated between the parties. *See* 42 C.F.R. § 411.357. As evidenced by the discussion above,

each remunerative scheme outlined herein takes into account the value of referrals to be

generated as a result of that remunerative scheme in that the clear intent of both Adventist and

FCS was to induce referrals through each of the various forms of remuneration paid from one to

the other. The remuneration they have exchanged would not have been offered or exchanged

absent a commitment to direct patient referrals in this manner and a structure tending to enforce

that commitment. Because the various forms of remuneration were conditioned on an agreement

to generate referrals, that remuneration necessarily takes into account the value of those referrals,

and no safe harbor is available.

22

### ii.    The Remuneration Paid Does not Reflect Fair Market Value

52.    The requirement contained in many AKS and Stark Law safe harbors that the remuneration reflect fair market value is also not satisfied here.[4] No fair market valuation was conducted as to any remuneration exchanged under the exclusive services and medical director agreements. Nor does that remuneration in fact reflect fair market value. It is facially apparent that trading, for instance, an agreement not to compete in the radiation oncology market for the exclusive right to credential oncologists and hematologists at Adventist hospitals cannot be considered a "fair market value" exchange, particularly where no determination of whether it would be was attempted by either Adventist or FCS. The failure to investigate the question of fair market value also further establishes the reckless disregard for the truth or falsity of the claims Adventist and FCS have submitted claims to Medicare and Medicaid since their remunerative schemes were put in place.

### iii.    Multiple Forms of Compensation Are Not Set Out in Writing

53.    Further, the Stark Law safe harbor for fair market value compensation, 42 C.F.R. § 411.357(l), requires that the compensation be set out in writing in order to be eligible for the safe harbor. Here, at least two forms of compensation are not set out in writing—the trading of outpatient referrals between Adventist and FCS, which constitutes compensation paid by each to the other, and the free (and exclusive) marketing that Adventist provides to FCS, which is compensation paid by Adventist to FCS. As such, the Stark Law's safe harbor for fair market value compensation is not available for these arrangements.

---

[4] The fair market value requirement applies equally to intangible remuneration, including the forms of remuneration outlined above. *See Kosenske*, 554 F.3d at 97–98 (holding that exclusive right to provide services at hospital is subject to fair market value requirement for purposes of Stark Law's personal services agreement safe harbor).

### iv.    The Arrangements Are Not Commercially Reasonable

54.    The additional requirement of many AKS and Stark Law safe harbors that the arrangement be commercially reasonable is also not satisfied here. In order to satisfy this requirement, the arrangement must be a sensible, prudent business arrangement, from the perspective of the parties involved, even in the absence of potential referrals. The remunerative schemes outlined above serve no arguable purpose other than effectuating the trading of referrals. As Adventist and FCS executives have testified, oncology is predominantly an outpatient-based specialty, and the referrals traded between Adventist and FCS are predominantly outpatient referrals. Yet the scope of the exclusive services agreement is limited to the practice of oncology in an inpatient setting. Further, even with respect to the inpatient practice of oncology at Adventist's Volusia and Flagler hospitals, there is no indication that the closure of the medical staff to non-FCS oncologists was in any way necessary or beneficial to any business purpose. Adventist's executives have testified that the physicians practicing with Relators' oncology group are equally skilled oncologists and that quality of care was not in any way a basis for granting FCS the exclusive right to credential physicians to practice at the hospitals. Nor was there any problem with call coverage or any other aspect of Relators' practice at the hospitals in question. Indeed, limiting the number of physicians who may be consulted increases the likelihood that there will be challenges covering call.

55.    The true value of the exclusive services agreement between Adventist and FCS lies in the referrals that Adventist and FCS generate for one another, specifically for the Designated Health Services that will be rendered as a result of those referrals. In the absence of these referrals, the exclusive services agreement would consist, at bottom, of agreements not to compete and the closure of the medical staff at Adventist's hospitals in Volusia and Flagler to all non-FCS

hematologists and medical oncologists. These are not legitimate business purposes that could support a finding of commercial reasonableness.

**F. Damages**

56.     "[T]he amount of the Government's damages resulting from the payment of false claims tainted by a kickback arrangement equals the full amount that Medicare paid on such claims." *U.S. ex rel. Freedman v. Suarez-Hoyos*, No. 8:04-CV-933-T-24 EAJ, 2012 WL 4344199, at *4 (M.D. Fla. Sept. 21, 2012); *U.S. v. Rogan,* 517 F.3d 449 (7th Cir. 2008). Here, the government's damages are tremendous. For instance, when a patient is referred from the emergency department of an Adventist Hospital, or from a primary care or specialist physician employed by Adventist (or an administrator doling out referrals for which those employed physicians have been instructed not to specify anything other than a specialty) to an FCS physician, all of the claims billed by FCS for services provided to that patient are tainted by kickbacks and, therefore, are false claims. Those claims, in the aggregate, include claims for chemotherapy drugs and administration, lab work, pathology, and a variety of other downstream services. When FCS then directs those patients back to Adventist for surgery, for radiation oncology or radiology/imaging services, or for the various non-oncology-related labs, consultative services, and procedures for which FCS generates referrals to Adventist, those claims also are tainted by kickbacks and, therefore, false.

57.     The entire amounts of these claims are the measure of the government's damages as to those claims. Of course, those damages are subject to trebling, and each violation of the AKS is additionally subject to significant statutory penalties. Further, a high proportion of oncology patients are Medicare enrollees. Almost half of Relators' patients are insured by Medicare, and it could reasonably be expected that half of the claims submitted by Adventist and FCS for

oncology-related care are Medicare claims. The remunerative schemes outlined above have also resulted in submission of many false Medicaid claims.

## V.    Counts

### COUNT I: FALSE OR FRAUDULENT CLAIMS
### 31 U.S.C. § 3729(a)(1)(A), (B), and (C)

58.    Relators repeat and reallege the prior paragraphs as if fully set forth herein.

59.    Relators bring these claims on behalf of the United States, for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729–3733, against Defendants, for knowingly causing to be presented false claims to government healthcare programs.

60.    As a result of acts described above, Defendants knowingly presented, or caused to be presented, false and fraudulent claims for services that were not eligible for reimbursement for payment or approval to the United States in violation of 31 U.S.C. § 3729(a)(1)(A).

61.    Further, as a result of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or false statements material to the foregoing false or fraudulent claims to get these false or fraudulent claims paid and approved by the United States, in violation of 31 U.S.C. § 3729(a)(1)(B).

62.    Finally, by virtue of the acts described above, Defendants knowingly conspired with each other to present or cause to be presented to the United States false or fraudulent claims for payment or approval; to make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(C).

63.    As a direct and proximate result of Defendants' violations, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

## COUNT II: FLORIDA FALSE CLAIMS ACT
### Fla. Stat. Ann. §§ 68.081–68.092

64.     Relator re-alleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

65.     Defendants violated the Florida False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Florida as described herein.

66.     As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Florida.

67.     The State of Florida, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Florida would not otherwise have paid.

68.     By reason of these payments, the State of Florida has been damaged, and continues to be damaged, in a substantial amount.

**VI.     Prayer for Relief**

WHEREFORE, Relators, on behalf of themselves, the United States, and the State of Florida, pray:

I.      That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty for each violation, costs, and post-judgment interest;

II.     That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Florida has sustained because of Defendants' actions, plus a civil penalty for each violation, costs, and post-judgment interest;

27

III.    That Relators be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, as provided under the False Claims Act and the Florida False Claims Act;

IV.    That Relators be awarded all costs and expenses incurred, including reasonable attorneys' fees;

V.    That the Court order such other relief as is appropriate.

**VII.    Demand for Jury Trial**

Relators demand a trial by jury.

Dated: January __, 2018                    Respectfully submitted,

C. Nicholas Dorman
Whatley Kallas, LLP
Florida Bar No.  117504
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203
Tel:  (205) 488-1230
Fax:  (800) 922-4851
Email:  ndorman@whatleykallas.com